**No. 25-51033**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

Brenda Ramos, on behalf of herself and the Estate of Mike Ramos,

***Plaintiff – Appellee***

v.

Christopher Taylor,

***Defendant – Appellant***

---

On Appeal from United States District Court
for the Western District of Texas
No. 1:20-cv-01256
Hon. Robert Pitman, District Judge

---

# AMENDED BRIEF OF APPELLANT CHRISTOPHER TAYLOR

---

**Stephen B. Barron**
State Bar No. 24109619
sbarron@w-g.com
**WRIGHT & GREENHILL, P.C.**
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
512-476-4600
512-476-5382 – Fax

**Blair J. Leake**
State Bar No. 24081630
bleake@w-g.com
**WRIGHT & GREENHILL, P.C.**
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
512-476-4600
512-476-5382 – Fax

**ATTORNEYS FOR APPELLANT**
**CHRISTOPHER TAYLOR**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Interested Party | Interest |
|---|---|
| Brenda Ramos<br>The Estate of Mike Ramos | Plaintiffs-Appellees |
| Scott Hendler<br>Leigh A. Joseph<br>**HENDLER & FLORES LAW, PLLC**<br>901 S. Mopac Expressway<br>Building 1, Suite 300<br>Austin, Texas 78746<br><br>*and*<br><br>Rebecca Ruth Webber<br>**WEBBER LAW**<br>4228 Threadgill St.<br>Austin, Texas 78723 | Trial Counsel<br>for Plaintiffs-Appellees |
| Thad D. Spalding<br>Shelby White<br>**DURHAM, PITTARD & SPALDING, LLP**<br>P.O. Box 224626<br>Dallas, Texas 75222<br>(214) 946-8000 | Appellate Counsel<br>for Plaintiffs-Appellees |
| Former Austin Police Officer<br>Christopher Taylor | Defendant-Appellant |

| | |
|---|---|
| Stephen B. Barron<br>Blair J. Leake<br>**WRIGHT & GREENHILL, P.C.**<br>4700 Mueller Boulevard, Suite 200<br>Austin, Texas 78723 | Counsel for Defendant-Appellant<br>Officer Christopher Taylor |
| The City Austin, Texas | Defendant (Not a party to this appeal). |
| Eric J.R. Nichols<br>Jordan Jarreau<br>**BUTLER SNOW, LLP**<br>1400 Lavaca Street, Suite 1000<br>Austin, Texas 78701<br><br>*and*<br><br>Monte L. Barton<br>**City of Austin Law Department**<br>P.O. Box 1546, Austin, TX 78767-1546 | Counsel for Defendant<br>The City of Austin |

/s/ Stephen B. Barron
Stephen B. Barron
Attorney of Record for Appellant
Christopher Taylor
**March 26, 2026.**

# TABLE OF CONTENTS

Certificate of Interested Persons .......... ii

Table of Contents .......... iv

Statement Regarding Oral Argument .......... ix

Index of Authorities .......... vi

Statement Regarding Oral Argument .......... ix

Statement of the Record .......... x

Jurisdictional Statement .......... xi

Statement of the Issues Presented .......... 1

Statement of the Case .......... 2

Summary of the Argument .......... 19

Arguments & Authorities .......... 22

A. Issue 1: As a matter of first impression, this Court should hold that a district court does not have discretion to refuse review of video evidence that is otherwise ripe for consideration at the 12(b)(6) stage when qualified immunity has been raised. .......... 22

  a. It is beyond serious dispute that this Court's clear and consistent precedents authorized the district court below to review the video evidence. .......... 22

  b. The Supreme Court mandates that qualified immunity's core purpose is to resolve the immunity question at the earliest possible stage of litigation. This Court has reversed lower courts that have used their discretion to frustrate that aim. .......... 23

  c. Conclusion: When video evidence is properly part of the pleadings record, qualified immunity must require district courts to review and apply that evidence at the Rule 12(b)(6) stage—because under *Scott* and this Court's precedents, objective video evidence is almost always dispositive to the qualified immunity question and thus cannot be ignored without depriving defendants of a determination at the earliest stage of litigation. .......... 25

B. Issue 2: The video evidence blatantly contradicts Appellees' pleadings accusing Officer Taylor of violating Ramos's constitutional right to be free from excessive force under the Fourth Amendment. The videos show that no constitutional violation occurred here. Taylor is therefore entitled to qualified immunity under first prong of the defense.................................................. 27

a. Standard of review on interlocutory appeal....................................... 27

b. The *Graham* factors.......................................................................... 27

a. The Deadly Force Standard..................................................... 28

b. The first and third *Graham* factors weigh for Officer Taylor's force........................................................ 29

c. Second *Graham* factor: An objectively reasonable officer in Officer Taylor's position could perceive an immediate threat of serious harm the moment Ramos moved his car forward to flee in contravention to voluminous police commands. Under *Barnes*, Taylor's decision to use force was not a violation of the Fourth Amendment ...................................................................... 29

C. Issue 3: Officer Taylor's decision to use deadly force did not violate clearly established law. This Court's ruling in *Estevis* demonstrates that *Lytle* hardly placed it "beyond debate" that every reasonable official would have understood using lethal force on Ramos under the totality of the circumstances was a violation of the Fourth Amendment............................................................ 32

Conclusion and Prayer ............................................................................ 35

Certificate of Compliance ........................................................................ 36

Certificate of Service ............................................................................. 36

# INDEX OF AUTHORITIES

**CASES** **PAGE**

*Anderson v. Estrada*,
140 F.4th 634 (5th Cir. 2025) ........ 23

*Argueta v. Jaradi*,
86 F.4th 1084 (5th Cir. 2023) ........ 28

*Asante-Chioke v. Dowdle*,
103 F.4th 1126 (5th Cir. 2024),
cert. denied, 145 S. Ct. 1051 (2025) ........ 25

*Baker v. Coburn*,
68 F.4th 240 (5th Cir. 2023) ........ 28, 29

*Bakutis v. Dean*,
129 F.4th 299 (5th Cir. 2025) ........ 33

*Barnes v. Felix*,
605 U.S. 73 (2025) ........ 20, 28

*Barnes v. Felix*,
152 F.4th 669, 674 (5th Cir. 2025) ........ *passim*

*Bazan ex rel. Bazan v. Hidalgo Cnty.*,
246 F.3d 481, 487 (5th Cir. 2001)) ........ 28

*Benavides v. Nunez*,
144 F.4th 751, 755 (5th Cir. 2025) ........ 27

*Carswell v. Camp*,
54 F.4th 307, 310 (5th Cir. 2022) ........ 24

*Darden v. City of Fort Worth,*
*Tex.*, 880 F.3d 722 (5th Cir. 2018) ........ 29

*Deshotels v. Marshall*,
454 Fed. Appx. 262, 267 (5th Cir. 2011) ........ 28

**CASES (CONT'D)** **PAGE**

*Edmiston v. Borrego*,
75 F.4th 551 (5th Cir. 2023) ........................................................ 27

*Edwards v. Oliver*,
31 F.4th 925 (5th Cir. 2022) ........................................................ 30

*Estevis v. Cantu*,
134 F.4th 793 (5th Cir. 2025) ........................................................ 33

*Faire v. City of Arlington*,
957 F.2d 1268 (5th Cir. 1992)) ........................................................ 30

*Garcia v. Orta*,
47 F.4th 343 (5th Cir. 2022) ........................................................ xi

*Graham v. Connor*,
490 U.S. 386 (1989) ........................................................ 27

*Kennedy v. City of Arlington, Tex.*,
165 F.4th 937 (5th Cir. 2026) ........................................................ 3, 23

*Knotts v. Ledbetter*,
No. 25-10346 2026 WL 637287 (5th Cir. Mar. 6, 2026) ............................ 23

*Lytle v. Bexar Cnty., Texas*,
560 F.3d 4040, 408 (5th Cir. 2009) ........................................................ 33

*Mace v. City of Palestine*,
333 F.3d 621, 624 (5th Cir. 2003) ........................................................ 28

*Malbrough v. Stelly*,
814 Fed. Appx. 798, 804 (5th Cir. 2020) ........................................................ 30

*Mitchell v. Forsyth*,
472 U.S. 511, 528 (1985) ........................................................ xi

*Pearson v. Callahan*,
555 U.S. 223, 237 (2009) ........................................................ 24

**CASES (CONT'D)** **PAGE**

*Plumhoff v. Rickard*,
572 U.S. 765 (2014)) .......... 20, 31, 34

*Ramos v. Taylor*,
646 F. Supp. 3d 807, 815 (W.D. Tex. 2022) .......... xi, 14, 18

*Salazar v. Molina*,
37 F.4th 278 (5th Cir. 2022),
cert. denied, 143 S. Ct. 1781 (2023) .......... ix

*Salinas v. City of Houston*,
138 F.4th 822 (5th Cir. 2025) .......... 26

*Scott v. Harris*,
550 U.S. 372 (2007) .......... 25

*Terrell v. Allgrunn*,
114 F.4th 428 (5th Cir. 2024) .......... 29

*Winder v. Gallardo*,
118 F.4th 638 (5th Cir. 2024),
cert. denied, 145 S. Ct. 2816 (2025) .......... 17

**STATUTES** **PAGE**

28 U.S.C.A. § 1291 .......... xii

42 U.S.C.A. § 1983 .......... 2

**RULES** **PAGE**

FED. R. CIV. P. 12 .......... 27

FED. R. APP. P. 32(a)(7)(B) .......... 36

Fed. R. App. P. 32(a)(5) .......... 36

FED. R. APP. P. 32(a)(6) .......... 36

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Christopher Taylor (hereinafter "Officer Taylor") requests the opportunity to present oral argument to assist in the presentation of the issues, and because this Court's decisional process would be aided by oral argument. This is a complex case involving the denial of qualified immunity for an excessive force claim. This is an area of the law that this Court has held requires "careful attention to the facts and circumstances of each particular case…".[1]

Furthermore, this case bids this Court's attention on a matter of first impression. Plaintiffs-Appellees Brenda Ramos and the Estate of Michael Ramos (hereinafter "Appellees") incorporated screenshots of Officer Taylor's Body-Camera and other media evidence into their Third Amended Complaint. In response, Taylor filed a motion to dismiss asserting the defense of qualified immunity and attached his Body-Camera and other video evidence to support that defense—as this Court explicitly approved of in *Winder v. Gallardo*. Below, the district court refused to view that evidence, determining that "Taylor does not and cannot cite any language that a district court is *required* to review videos attached to a motion to dismiss, even if the exhibit *may* be viewed." This Court should grant oral argument to discuss whether it will provide the requirement the district court was seeking in this case.

[1] *Salazar v. Molina*, 37 F.4th 278, 281 (5th Cir. 2022), cert. denied, 143 S. Ct. 1781 (2023).

## STATEMENT OF THE RECORD

In compliance with Fifth Circuit Rule 28.2.2 and Fifth Circuit Court of Appeals Form 1, Guidance for Record References and as directed by the Clerk of the Court, the Record on Appeal will be referenced using the short form "ROA" followed by a period, followed by the page number. **ROA.[page number]**.

Because there are media exhibits relevant to this Interlocutory Appeal, those media exhibits will be cited by referencing where they were submitted as evidence in Record on Appeal, followed by a description of the media file, and then the relevant media timestamp. **ROA.[page number], [media exhibit], [timestamp].**

# JURISDICTIONAL STATEMENT

This appeal arises from the denial of Officer Taylor's motion to dismiss on his assertion that he is entitled to the defense of qualified immunity.[2] On December 5, 2025, the Honorable District Judge Robert Pitman denied Officer Taylor's motion to dismiss Appellees' Third Amended Complaint. On December 8, 2025, Officer Taylor timely filed his Notice of Immediate Interlocutory Appeal.[3]

Under 28 U.S.C.A. § 1291, a district court's denial of a motion to dismiss is not generally a final decision that is immediately appealable.[4] However, the denial of qualified immunity is immediately appealable under the collateral order doctrine when based on an issue of law.[5]

This Court found jurisdiction proper in this case on January 23, 2026—when a panel of this Court issued a *per curiam* decision denying Appellees' Motion to Dismiss for Want of Jurisdiction.[6]

---

[2] **ROA.1089 – 1097** (District Court's Order denying motion to dismiss).
[3] **ROA.1098 – 1101**. (Notice of Appeal).
[4] 28 U.S.C.A. § 1291.
[5] *Garcia v. Orta*, 47 F.4th 343, 349, 50 – 51 (5th Cir. 2022) (The one exception to this rule restricting this Court's review is that "a court of appeals may consider, on interlocutory appeal, still photographs and video evidence to evaluate whether the district court erred by relying on the plaintiff's version of the facts."); *see also Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985).
[6] Order, *Ramos v. Taylor*, 25-51003, (5th Cir. Jan 23, 2026) (per curiam).

## STATEMENT OF ISSUES PRESENTED

**Issue 1**: As a matter of first impression, does a district court have discretion to refuse to review video evidence that it is permitted to consider, under this Court's precedent in *Winder v. Gallardo*, when ruling on a Rule 12(b)(6) motion asserting qualified immunity—or does this discretion frustrate qualified immunity's core purpose of securing a determination at the earliest possible stage of litigation?

**Issue 2**: Did the district court err by crediting Appellees' allegations accusing Officer Taylor of excessive force when the incorporated and properly reviewable video evidence blatantly contradicts those allegations and demonstrates, as a matter of law, that no Fourth Amendment violation occurred under *Barnes v. Felix*—entitling Officer Taylor to qualified immunity under the first prong of the defense?

**Issue 3**: Assuming arguendo that a constitutional violation could be inferred, did the district court err by concluding that clearly established law placed it beyond debate that Officer Taylor's split-second use of deadly force under these circumstances was unconstitutional—despite the absence of factually similar, controlling precedent and this Court's recent decision in *Estevis* that sharply limited the scope of *Lytle*?

## STATEMENT OF THE CASE

### A. Causes of Action on Appeal.

1. The only relevant cause of action in this interlocutory appeal, asserted by Appellees, is found in their live Third Amended Complaint.[7] Within, they bring a 42 U.S.C. §1983 claim alleging that Austin Police Officer Christopher Taylor used force excessive to the need on Michael Ramos (hereinafter "Ramos") in violation of the Fourth Amendment.[8]

### B. Facts and incorporations pled in the Third Amended Complaint.

2. Appellees' Third Amended Complaint pleads that on April 24, 2020, Officer Taylor wrongfully used deadly force when he fired at Ramos three times as Ramos tried to flee a felony car stop in his gold and black Toyota prius.[9] In asserting that Officer Taylor's force was wrongful, Appellees' incorporated a screenshot of Taylor's body-worn camera and stated "[b]elow is a still image taken from Taylor's body camera at the moment he fired his rifle three times."[10] Appellees went on to plead that this image ostensibly revealed that force was wrongful under *Lytle v. Bexar County* because they asserted it depicted Ramos as fleeing away from officers in the moment shots were fired.[11]

---

[7] **ROA.791 – 833** (the live Third Amended Complaint).
[8] **ROA.824 – 828** (Appellees' claim against Taylor).
[9] **ROA.803** (date) **ROA.814** (three shots).
[10] **ROA.814** (Appellees' screenshot of Officer Taylor's Body-Camera).
[11] **ROA.815**; *see also* **ROA.827** (citing *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 417 – 18 (5th Cir. 2009)).

3. Appellees explicitly incorporated other media. Appellees included screenshots from Austin Police Officer Cantu-Harkless's dash-camera, and they appended as Exhibit A their proffered transcription of the 911 call that summoned the Austin Police Department to arrest Ramos at the Rosemont Oak Valley Apartments.[12]

4. Appellees also comprehensively diagramed this and other media obtained from civilian cameras to place all of the APD officers on scene, and to diagram Ramos's actions at specific times and to plead the exact positioning of the Prius during this incident to support their claim for excessive force.[13]

5. Officer Taylor now recites the facts as depicted by the media Appellees incorporated into their Third Amended Complaint—in addition to other media that captured this incident—because it is referenced and clearly central to their claims.[14]

### C. Facts relevant to appeal as depicted by incorporated video evidence.[15]

#### a. On April 24, 2020, a 911 caller reported that a man in a gold and black prius was "smoking crack" and "holding a gun" up near his female passenger.

[12] **ROA.807,** (screenshot of dash-camera); *see also* **ROA.831** (911 call transcription).

[13] **ROA.812**

[14] **ROA.815** (Appellees' pleading: "Austin police dashcam and body-worn camera videos show [Ramos] was outnumbered, confused and fearful, trying to make sense of the confusing and chaotic situation created by the police."); *see also Kennedy v. City of Arlington, Tex.*, 165 F.4th 937, 942 (5th Cir. 2026).

[15] The district court accepted Appellees' argument below that "five of the eight videos" were not depicted in Appellees' Third Amended Complaint as screenshots. Appellant Taylor's position is that all of the City of Austin's videos that captured this incident—and which are cited *infra*—were incorporated by reference and are central to the claims. **ROA.815**.

6. On April 24, 2020, a 911 caller reported that a suspicious man—later identified as Ramos—was sitting in a gold and black prius at the Rosemont Apartments.[16] The caller reported that the man was "smoking crack" or doing other hard drugs in the car, and that the caller had "seen him with a gun."[17] The caller initially told Dispatch that the man "has a gun to this lady" which she agreed was occurring "right now." The caller asserted the suspicious man was "holding it up" and the stated he was "pointing it at her." The caller then stated that she "did not know what was going on" but that Austin Police officers "needed to come quick." Upon further questioning from the Dispatcher, the caller did not repeat her claim that the man was pointing the gun at the woman.[18]

**b. Officer Christopher Taylor and numerous other APD Officers responded to this call because they recognized the description of the black and gold Prius. The officers stopped for five minutes to plan a "felony car stop" on Ramos. During the plan, they stressed the importance of blocking the entrance with their patrol cars—as they knew that was the only escape route.**

7. At around 6:30p.m., APD Officer Christopher Taylor and seven other APD officers received this suspicious-persons call via dispatch with a description of the gold and black Prius. The other APD officers were: (1) Officer Cantu-Harkless, (2) Officer

---

[16] **ROA.888**, *911 Call*, **00:00 – 00:33**.
[17] **ROA.888**, *911 Call*, **00:33 – 01:04**.
[18] **ROA.888**, *911 Call*, **01:04 – 02:15**.

Hart; (3) Officer Krycia; (4) Officer Morgan; (5) Officer Ratcliff; (6) Officer Tavarez; and (7) Officer Pieper.[19]

8. At approximately 6:35p.m., these eight APD officers staged nearby to develop a plan to arrest Ramos. Officer Hart took the lead during staging. At the time, Officer Taylor was sitting in his patrol vehicle. Officer Hart approached the car window and told Taylor how important "blocking the entrance" to the lot was so that Ramos could not escape police. Simultaneously, other officers noted over the radio that "there was only one way out of this area."[20] Officer Hart then stepped away from Officer Taylor's patrol car and began addressing all assembled officers. Hart said that his main "concern is that they get out of there." Hart then instructed other officers of the importance of using their patrol cars to block the entrance to the apartment complex so that the officers could conduct a "felony car stop."[21] Officer Hart stated that he would "have his rifle out" and asked others to have their rifle.[22] Officer Hart further told officers that they would not be so close as to "pen" the car into place because "if they've got a gun I don't want to do that that close."

---

[19] **ROA.804** at ¶ 36.
[20] **ROA.889**, *Hart BWC*, **00:30 – 01:06**.
[21] **ROA.889**, *Hart BWC*, **01:06 – 01:43**; *see also* **ROA.890**, *Taylor BWC*, **00:30** (Officer Taylor's body-camera activated just as Hart stated his "concern is that they get out of there" which can be heard just outside Taylor's patrol car window).
[22] **ROA.889**, *Hart BWC*, **01:43 – 02:04**; *see also* **ROA.890**, *Taylor BWC*, **01:00 – 1:30** (during this time, Officer Taylor likewise prepared his rifle as he sat in his patrol car listening to the plan).

9. Finally, Officer Hart articulated the reason why so many officers were responding. Hart stated "we know this car, its one we've been dealing with. We've been actually looking for it" and "it's going to be pretty obvious when we see it."[23]

10. Before leaving, Officer Taylor's body-worn camera captures that Taylor reviewed a map of the layout of the apartment complex's parking lot on the computer in his patrol car. The map depicts only one exit.[24] Planning completed, the officers left to engage Ramos in a felony car stop, and to catch the Prius law enforcement had been searching for.

**c. Officer Taylor and his fellow APD Officer conducted a felony car stop on Ramos. At first, Ramos mostly complied with officer commands and lifted up his shirt to show he did not have a gun on his person. But Ramos became increasingly erratic and furtive as the encounter continued. Eventually, he refused to walk towards officers and submit to arrest.**

11. Officer Taylor drove to the scene and, consistent with the plan, parked his patrol vehicle behind his fellow officers' patrol vehicles. In keeping with the plan that Taylor was a part of, Taylor's body-camera clearly depicts that his fellows deliberately parked to block Ramos from the only viable escape route.[25]

12. Taylor then exited his car and ran to position himself on the passenger's side of Officer Cantu-Harkless's patrol car. Once in position, Taylor braced his rifle on the passenger side mirror.[26] Taylor's body-camera depicts that the Prius was a mere ten

---

[23] **ROA.889**, *Hart BWC*, **02:04 – 02:20**.
[24] **ROA.890**, *Taylor BWC*, **01:58 – 02:05**.
[25] **ROA.890**, *Taylor BWC*, **02:45 – 03:48**.
[26] **ROA.890**, *Taylor BWC*, **03:48 – 03:57**.

feet—or approximately one car length—away from the front of Officer Cantu-Harkness's patrol car. The dash-camera mounted on the front of Cantu-Harkness's patrol car captured what followed next.[27]

13. For the initial thirty-five (35) seconds of the encounter, Officer Cantu-Harkless and Officer Hart began to give numerous commands to the "driver" and the passenger to keep their hands up and visible.[28] The driver slowly opened his door, and Officer Cantu-Harkless then positively identified the searched-for Michael Ramos. Officer Cantu-Harkless then issued Ramos numerous commands to step out of the vehicle with his hands up. Ramos eventually obeyed, stepped out with his hands up, and appeared to be complying with commands.[29] Meantime, Officer Taylor provided lethal cover with his rifle to protect his fellows as per the plan.[30]

14. Officer Cantu-Harkless then commanded Ramos to lift up his shirt so that the officers on scene could see if Ramos had a gun in his waistband. Again, Ramos complied and made a quick movement that lifted up his shirt—allowing officers to see if the reported gun was in his front waistband. Officer Cantu-Harkless commanded Ramos to slowly turn around in a circle so that officers could see if a gun was tucked into the back of his waistband. Ramos again complied, but Ramos simultaneously took

---

[27] **ROA.892**, *Cantu-Harkness Dash*, **04:00**.
[28] **ROA.892**, *Cantu-Harkness Dash*, **04:00 – 04:35**; **ROA.891**, *Cantu-Harkness BWC*, **04:00 – 04:35**; *see also* **ROA.889**, *Hart BWC*, **04:40 – 05:15**.
[29] **ROA.892**, *Cantu-Harkness Dash*, **04:50 – 05:10**; **ROA.891**, *Cantu-Harkness BWC*, **04:50 – 05:10**.
[30] **ROA.890**, *Taylor BWC*, **04:50**.

the opportunity to furtively step away from officers and back towards the driver's side door of the Prius.[31]

15. Officer Taylor—speaking to Ramos for the first time—immediately commanded Ramos to "come towards us!" and away from the Prius that had not yet been searched for the reported handgun.[32] Officer Cantu-Harkless repeated this command seconds later, saying, "Michael Ramos, you are going to get impacted if you don't listen, walk towards me." Michael Ramos replied by saying "man, what the fuck," and refused to comply with the commands to come towards the officers.[33] Instead of complying, the video evidence shows that Ramos began casting his gaze around the scene—as if searching for an avenue of escape. Simultaneously, Ramos continued creeping closer to the ajar Prius.[34]

**d. Ramos began to completely disobey commands. Instead of complying with officer instructions to come towards them, Ramos remained by the Prius and began cussing out officers. In an attempt to take the non-compliant Ramos into custody, Officer Taylor and other officers instructed Officer Pieper to use a less lethal beanbag round on Ramos to instill compliance. Once impacted, Ramos fled back into the Prius.**

16. Meantime, Ramos began disobeying clear commands, and Officer Taylor called out to his fellow officers "do we have a less lethal?"[35] Mere moments later, Officer

---

[31] **ROA.892**, *Cantu-Harkness Dash*, **05:20 – 05:33**; **ROA.891**, *Cantu-Harkness BWC*, **05:20 – 05:33**.
[32] **ROA.890**, *Taylor BWC*, **05:12 – 05:15**.
[33] **ROA.892**, *Cantu-Harkness Dash*, **05:33 – 05:43**; **ROA.891**, *Cantu-Harkness BWC*, **05:33 – 05:43**; *see also* **ROA.890**, *Taylor BWC*, **05:12 – 05:22**.
[34] **ROA.892**, *Cantu-Harkness Dash*, **05:43 – 06:00**.
[35] **ROA.890**, *Taylor BWC*, **05:12 – 05:22**.

Pieper walked up behind Officer Taylor and Officer Hart, and declared that he possessed a "less lethal" shotgun.[36] Officer Taylor immediately told Officer Pieper to "move up" so that he could be ready to "impact" Ramos with a beanbag.[37] By now, Ramos was leaning up against the side of the Prius driver's side door and continued to take small furtive steps towards its interior. Officer Hart simultaneously called for Officer Pieper to "go with it" and be prepared to impact Ramos.[38] The videos show that Ramos continued his furtive movements back towards the Prius—and that he had now placed the ajar driver's door between himself and the APD officers.[39]

17. Officers called out, "don't go back" and Taylor told Officer Pieper, "impact up, impact up." Officer Hart similarly stated, "impact up, get it ready."[40] But the car door now deprived Officer Pieper of an angle to use the less lethal weapon, and Officer Pieper called out, "I can't, I don't have an angle, I'm going to have to go to the right."[41] Officer Taylor told Officer Pieper to "take a deep breath, and reposition to the right side of that car."[42]

18. As Officer Pieper repositioned, the non-compliant Ramos was loudly commanded to "get on your knees."[43] The video shows Ramos declined to comply.

[36] **ROA.893**, *Pieper BWC*, **05:40 – 05:45** (Pieper announcing to officer Hart that he has a less lethal weapon); **ROA.889**, *Hart BWC*, **06:20 – 6:35**.
[37] **ROA.890**, *Taylor BWC*, **05:12 – 05:22**.
[38] **ROA.889**, *Hart BWC*, **06:35 – 06:40**.
[39] **ROA.892**, *Cantu-Harkness Dash*, **06:00 – 06:15**.
[40] **ROA.890**, *Taylor BWC*, **05:40 – 05:47**; *see also* **ROA.889**, *Hart BWC*, **06:43 – 06:50**.
[41] **ROA.893**, *Pieper BWC*, **06:00 – 06:10**
[42] **ROA.890**, *Taylor BWC*, **05:50 – 06:00.**
[43] **ROA.892**, *Cantu-Harkness Dash*, **05:43 – 06:00**.

Instead, he responded by ***screaming***, "man what the fuck you fucking shootin' man?" and "what the fuck you trippin on dog?"[44] Simultaneously, Officer Taylor and several other officers yelled out, "impact him."[45] Ramos continued screaming, "why all you got guns?" Then, louder this time, Officer Taylor ***yelled,*** "impact him!"[46]

19. Officer Pieper, now repositioned farther to the right briefly asked Officer Kryica, "hit him?" Officer Kryica responded, "whenever you feel justified, he's not following my commands and he has a weapon in the vehicle."[47] Officer Pieper then yelled at Ramos, "walk towards! I'm going to impact you!" Ramos shouted, "[i]mpact me? For what?" Officer Pieper yelled back, "walk towards us! Comply with us! Comply with us!" Ramos remained where he was, non-compliant, and he cussed out the officers. Officer Pieper screamed, "impacting!" and hit Ramos with a less lethal round in the left thigh.[48]

20. The video evidence from Officer Taylor and Officer Tavarez's body-cameras depict that Officer Taylor observed the less lethal round hit Ramos. The videos also depict a furious looking Ramos respond by ***immediately*** getting back into the Prius. In that moment, the video also depicts that Officer Taylor stopped bracing his rifle on the passenger window, that he raised it, and that he began actively aiming at Ramos.[49]

---

[44] **ROA.892**, *Cantu-Harkness Dash*, **06:15 – 06:36**.
[45] **ROA.890**, *Taylor BWC*, **06:00 – 6:15.**
[46] **ROA.890**, *Taylor BWC*, **06:15 – 06:20.**
[47] **ROA.893**, *Pieper BWC*, **06:30 – 06:42**
[48] **ROA.893**, *Pieper BWC*, **06:42 – 06:56**.
[49] **ROA.890**, *Taylor BWC*, **06:40 – 06:47**; *see also* **ROA.894**, *Tavarez BWC*, **04:54**.

#### e. The Use of Force Incident.[50]

21. At **Taylor BWC 06:47**, Ramos slammed the Prius door shut. At **Cantu-Harkness Dash 07:08**, the Officers screamed out "do not do it" and "turn off the car, Michael don't do it!" Meantime, at **Cantu-Harkness Dash 07:16**, the female passenger can be seen refusing to get into the car with Ramos, and she can audibly be heard saying, "I gotta go."

22. At **Tavarez BWC 05:07**, Officer Tavarez speaks up right behind Officer Taylor and says "He's gonna start the car." At **Hart BWC 08:00**, the engines on the Prius can be heard revving and the car comes forward. At **Hart BWC 8:02,** Officer Hart—standing just to the right of Taylor—turns to his fellow officers and yells "hey get ready…RUN!"

23. In the exact same split second that Hart yelled for his fellow officers to run—at **Hart BWC 8:02** and **Taylor BWC 7:01**—Officer Taylor fired three quick shots from his service rifle. The Prius blurs on Taylor's body-camera video at the exact split-second moment that the first shot was fired—as recreated in the still image *infra*.

[50] For the purposes of this subsection, the video evidence will be cited using the Officer's name, the media type, and the media timestamp.




24. By **Taylor BWC 7:02**, force had finished. It accordingly stopped one second after it began. The joint reactions of other APD Officers can be seen at **Tavarez Dash 5:20**. At that moment, the video evidence depicts four officers scrambled away in reaction to Ramos's decision to drive his vehicle forward—in accord with Officer Hart's screamed command to run.[51]

**f. Aftermath.**

25. Officer Taylor's body-camera footage depicts that the officers on scene immediately rushed to the Prius in order to render emergency aid.[52] After force was used, the Prius drifted towards a nearby covered area of the parking lot filled with other vehicles. It came to a stop when it collided with those other cars. For the next several

[51] *See* **ROA.895,** *Tavarez Dash Cam*, **5:20**.
[52] **ROA.890**, *Taylor BWC*, **07:05 – 07:15**.

minutes, Officer Taylor's footage depicts that officers worked to remove Ramos from the Prius. EMS had to reach Ramos on foot by walking through the grass because APD patrol vehicles prevented any vehicle from entering or leaving the premises.[53] Later—after EMS arrived—APD Helicopter Air1 captured an aerial view of the scene as Ramos was being treated. This footage again depicts that APD patrol vehicles blocked the only viable vehicular exit on the premises. [54]

26. Officer Christopher Taylor was subsequently indicted for Murder by the Travis County District Attorney.[55]

**D. Relevant procedural history in the district court.**

27. Appellees filed their Second Amended Complaint on March 15, 2022.[56] Departing from their Original Complaint and First Amended Complaints, Appellees' Second Amended Complaint incorporated numerous screenshots from videos that captured the incident that makes the basis of their lawsuit against Officer Taylor.[57] Appellees additionally cited a link to YouTube videos released by the City of Austin to apprise the public of this incident.[58] Appellees also referenced a transcript of the 911 call that initiated the incident.[59]

---

[53] **ROA.890**, *Taylor BWC*, **07:15 – 12:15**.
[54] **ROA.896,** *Air1 Video,* **00:36.**
[55] Dante Motley, *Criminal charges dropped against Austin officer who shot Michael Ramos*, THE TEXAS TRIBUNE, (June 26, 2024), https://www.texastribune.org/2024/06/26/austin-police-shooting-michael-ramos-chris-taylor/ (last accessed March 20, 2026).
[56] **ROA.356 – 389**.
[57] **ROA.361, 363, 367, 368, 371**.
[58] **ROA.372** at n.8.
[59] **ROA.358** at n.1.

28. On April 12, 2022, Taylor filed a Motion to Dismiss the Second Amended Complaint.[60] In support of that motion, Officer Taylor attached screen-recordings of the YouTube videos at the other end of the links cited by Appellees.[61] In Response, Appellees moved the district court to strike those exhibits, claiming that they were unreliable and inauthentic.[62] In support, Appellees hired a video forensics expert, who signed a Declaration averring that "because the integrity of the audio/video synch has not been verified, these videos cannot reliably be used for a forensic analysis of the shooting of Mike Ramos, and they cannot reliably be used to draw the inferences and conclusions that Officer Taylor urges the Court to make in his Motion to Dismiss."[63]

29. On December 19, 2022, the district court denied Taylor's Motion to Dismiss the Second Amended Complaint.[64] In relevant part, the district held that (1) the videos were insufficiently referenced by the Complaint to be considered, and (2) found that "even if the videos were sufficiently referenced" the videos used were "screen-recordings of the YouTube videos themselves" and that Appellees had challenged the authenticity of those recordings.[65] Having declined to review video evidence, the

---

[60] **ROA.410 – 428**.
[61] **ROA. 429 – 431**.
[62] **ROA.520 – 535**.
[63] **ROA.545** at ¶ 24.
[64] *Ramos v. Taylor*, 646 F. Supp. 3d 807, 815 (W.D. Tex. 2022).
[65] *Id.*

district court held that the Second Amended Complaint plausibly stated an excessive force claim under the ambit of the Fourth Amendment.[66]

30. By June 27, 2023, the City of Austin filed a Motion to Stay this case pending the resolution of Taylor's concurrent criminal proceedings filed in State Court by the Travis County District Attorney's office.[67] Within, the City argued that the case had proceeded as far as it could, and noted that by this point the City had "produced over 9,000 pages of documents in this case" including the "multimedia files" in this case.[68] The district court granted the motion.[69]

31. Taylor's criminal jury trial took place between October 16, 2023, through November 7, 2023.[70] The case resulted in a mistrial, with eight jurors voting to acquit and four jurors voting to convict.[71] The criminal case lingered until February 21, 2025, when a Texas state court granted the Travis County District Attorney's Motion to Dismiss the criminal case against Taylor.

32. On March 31, 2025, the parties filed a joint motion to lift the district court's stay.[72]

---

[66] *Id.* (Noting "Plaintiff also alleges that the Prius "turned away from Taylor and all officers and headed slowly in the opposite direction" and "inched away toward" a dead end. Plaintiff alleges that Taylor was not in front of the Prius when he fired his shots. All of these alleged facts suggest that Ramos could not have reasonably posed a threat to Taylor or other officers.").

[67] **ROA.641**.

[68] **ROA.643**.

[69] **ROA.684**.

[70] **ROA.709 – 711**.

[71] Andrew Webber, *Jury can't agree on whether Austin police officer Christopher Taylor murdered Mike Ramos*, KUT NEWS, (Nov 15, 2023), https://www.kut.org/crime-justice/2023-11-15/christopher-taylor-trial-jury-undecided-mike-ramos (last accessed March. 20th, 2026).

[72] **ROA.712**.

33. On August 21, 2025, Ramos filed a Third Amended Complaint. Within, Appellees again incorporated a screenshot of Taylor's body-worn camera and stated "[b]elow is a still image taken from Taylor's body camera at the moment he fired his rifle three times."[73] Appellees also included screenshots from Cantu-Harkless's dash-camera, and they appended as Exhibit A their proffered transcription of the 911 call.[74] Appellees also plead and referenced all of the City's media exhibits, pleading "Austin police dashcam and body-worn camera videos show [Ramos] was outnumbered, confused and fearful, trying to make sense of the confusing and chaotic situation created by the police."[75] Appellees also comprehensively diagramed this and other media obtained from civilian cameras to place all of the APD officers on scene, and to diagram Ramos's actions at specific times and to plead the exact positioning of the Prius during this incident to support their claim for excessive force.[76]

34. Now in possession of authenticated copies of the City of Austin's multimedia videos depicting the incident captured by Appellees' screenshots, Taylor filed a Motion to Dismiss Plaintiff's Third Amended Complaint. The motion made novel legal and factual arguments and relied on the newly attached authenticated videos as evidence.[77]

---

[73] **ROA.814** (Appellees' screenshot of Officer Taylor's Body-Camera).
[74] **ROA.807,** (screenshot of dash-camera); *see also* **ROA.831** (911 call transcription).
[75] **ROA.815**.
[76] **ROA.812**
[77] **ROA.864 – 887**.

35. Appellees filed a Response to the Motion, and this time did not assert that the video evidence was inauthentic, nor did an expert opine that the evidence was unreliable.[78] Instead, Appellees urged the district court to disregard Taylor's novel reliance on this Court's 2024 jurisprudence in *Winder v. Gallardo*[79]—which Taylor cited for the proposition that this Court held that screenshots made video evidence reviewable at the 12(b)(6) stage. Appellees argued that *Winder* did not apply and that the case was based on "shaky legal precedent."[80]

### E. Ruling Presented for Appeal.

36. On December 5, 2025, the district court issued an Order denying Taylor's Motion to Dismiss the Third Amended Complaint.[81] In so holding, the district court stated that it would exercise its discretion under "the law of the case" doctrine and decline to review the new authenticated video evidence relied on by Taylor.[82] Explaining further, the district court held that "the Court disagrees that the Fifth Circuit's holding in *Winder* mandates the Court's review of Taylor's videos."[83] Furthermore, the district court noted that "Taylor does not and cannot cite any language that a district court is *required* to review videos attached to a motion to dismiss, even if the exhibit *may* be viewed."[84]

---

[78] **ROA.928 – 950**.
[79] *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024), cert. denied, 145 S. Ct. 2816 (2025).
[80] **ROA.938**.
[81] **ROA.1091**.
[82] **ROA.1093**.
[83] **ROA.1093**.
[84] **ROA.1094**.

**F. Appeal**.

37. On December 8, 2025, Officer Taylor filed a Notice of Interlocutory Appeal.[85] On December 22, 2025, Appellees filed a Motion to Dismiss this Appeal with this Court for want of jurisdiction. A panel of this Court denied that motion on January 23, 2026, in a *per curiam* decision.[86]

---

[85] **ROA.1098 – 1101**.

[86] Order, *Ramos v. Taylor*, 25-51003, (5th Cir. Jan 23, 2026) (per curiam).

## SUMMARY OF THE ARGUMENT

38. Austin Police Officer Christopher Taylor responded to an urgent 911 call reporting that a man in a black and gold Prius was brandishing a gun at a woman while consuming illegal drugs in the parking lot of the Rosemont Apartments. The video evidence depicts that APD officers were specifically looking for this Prius and its suspected driver—Michael Ramos. Prior to responding, Taylor and seven other officers made a plan to specifically use their patrol vehicles to physically block Ramos from escaping via the only exit from the parking lot. As part of the plan, Officer Taylor agreed to use his service rifle to provide protective cover for his colleagues due to the suspected presence of a gun.

39. Thus, when Ramos chose to drive forward in an attempt to flee law enforcement, Officer Taylor—tasked with providing protection—faced a split-second decision with only bad options. He could allow Ramos to drive away unchallenged and pray that Ramos would irrationally try to find a nonexistent exit.[87] Or, Taylor could use lethal force to protect himself and his fellow officers from a desperate man whose only real and logical avenue of escape would be to drive ***through*** the blockade. Any hesitation, and it would be too late to react. Officer Taylor chose the latter option—to protect his fellow officers. Years later, this Court articulated Taylor's dilemma in 2025 in *Barnes* on remand from the Supreme Court.

---

[87] If such an imaginary exit was found, no doubt a perilous chase through the City of Austin would commence.

40. "[T]he dangers to the public and police multiply when a driver flees."[88] Last year this Court wrote in *Barnes* that "no easy or risk-free answers present themselves when a driver takes off."[89] "Letting the driver go endangers the surrounding community and creates perverse incentives, degrading the respect due to those who protect and serve."[90] Intervention after flight "is even more dangerous, whether by giving chase, shooting out the driver's tires, or jumping onto the vehicle."[91]

41. With these principles in mind, this Court held in *Barnes* that an officer is entitled to qualified immunity when "a reasonable police officer could have concluded that [the suspect] was intent on flight and that if he were allowed to do so, he would pose a deadly threat for others on the road."[92] This holding acknowledged that when an officer has to react to a suspect using a car to flee, the officer faces "a split-second decision between only bad options."[93] Given the "little time [an officer has] to act" an officer can act "reasonably in using deadly force to end the risk of flight."[94]

42. Here, the clear video footage is replete with evidence of the "bad options" Officer Taylor faced, and the risk of imminent danger any objectively reasonable officer would discern from a man with only one escape route. Taken together, Taylor's

---

[88] *Barnes v. Felix*, 152 F.4th 669, 674 (5th Cir. 2025) (citing *Barnes v. Felix*, 605 U.S. 73, 84 – 90 (2025) (Kavanaugh, J., concurring)).
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.* at 676 (cleaned up).
[93] *Id.*
[94] *Id.* at 677 (cleaned up) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)).

split-second decision to use deadly force was not a violation of the Fourth Amendment and certainly no clearly established law placed it "beyond debate" that this conduct was unconstitutional. This Court should award Officer Taylor qualified immunity, and reverse and render the district court.

43. Below, however, the district court declined to review any video evidence—holding that no precedent from the Circuit required it do so. This appeal thus presents a question of first impression. Can a district court refuse to review dispositive video evidence that is properly before it when deciding a Rule 12(b)(6) motion asserting qualified immunity? This Court should answer no.

## ARGUMENTS & AUTHORITIES

**A. Issue 1: As a matter of first impression, this Court should hold that a district court does not have discretion to refuse review of video evidence that is otherwise ripe for consideration at the 12(b)(6) stage when qualified immunity has been raised.**

44. First, before discussing the merits, this interlocutory appeal presents a narrow but consequential question of law. Can a district court refuse to review video evidence that is properly before it at the 12(b)(6) stage when a defendant has invoked qualified immunity? The answer must be no.

**a. It is beyond dispute that this Court's clear and consistent precedents authorized the district court below to review the video evidence.**

45. As a matter of housekeeping, it is beyond serious dispute that the district court below *could* have reviewed the video evidence. In their Third Amended Complaint, Appellees expressly incorporated screenshots from Officer Taylor's body-worn camera and other video evidence and then relied on that media in an effort to plausibly plead their excessive-force claim.[95] Appellees also plead by reference all of the City's other available video evidence. Namely for the favorable proposition that all of the "Austin police dashcam and body-worn camera videos show [Ramos] was outnumbered, confused and fearful, trying to make sense of the confusing and chaotic situation created by the police."[96]

46. Below, Officer Taylor responded by attaching the full, authenticated versions of

---

[95] **ROA.814 – 15.**
[96] **ROA.815**.

that same video evidence in support of his qualified immunity defense. Under this Court's clear and consistent precedents, that evidence was properly before the district court. For instance, earlier this month, this Court reaffirmed in an unpublished opinion in *Knotts* that "where Plaintiffs reference video evidence and include several screenshots in their complaint and brief, our court can consider the video in its entirety."[97] In support of this proposition, the *Knotts* opinion cited this Court's published opinions in *Winder* and *Anderson*.[98]

47. But that's not all. Last February in *Kennedy*, this Court wrote:

> When evaluating a motion to dismiss, courts are usually confined to the complaint and its attachments. But when a defendant attaches documents to its motion that are referenced in the complaint and are central to the plaintiff's claims, then the court can also properly consider those documents. ***This principle applies equally to videos***: When a plaintiff relies on and references video evidence in their complaint and brief, Fifth Circuit caselaw supports our consideration of the video.[99]

Under *Kennedy* and all of these other very recent precedents, it is beyond dispute that the district court *could* have reviewed Officer Taylor's video evidence before ruling on his qualified immunity defense. The question therefore becomes should a district court be *required* to do so?

**b. The Supreme Court mandates that qualified immunity's core purpose is to resolve the immunity question at the earliest possible stage of litigation. This Court has reversed lower courts that have used their discretion to frustrate that aim.**

---

[97] *Knotts v. Ledbetter*, No. 25-10346 2026 Wl 637287, at *1 (5th Cir. Mar. 6, 2026).
[98] *Id.* (citing *Anderson v. Estrada*, 140 F.4th 634, 642 (5th Cir. 2025); *Winder*, 118 F.4th at 643. (5th Cir. 2024).
[99] *Kennedy v. City of Arlington, Tex.*, 165 F.4th 937, 942 (5th Cir. 2026) (emphasis added).

48. Qualified immunity is not merely a defense to liability. The defense is an immunity from suit.[100] As the Supreme Court explained in *Pearson v. Callahan*, the core principle of qualified immunity is to protect officials not only from liability, but from the costs of litigation and the incumbent burdens of broad-reaching discovery.[101] For that reason, the Supreme Court mandated that courts resolve the qualified immunity question "at the earliest *possible* stage in litigation."[102] This means that if a district court can possibly consider dispositive video evidence it should. But if a district court can *decline* consideration on naught but its own discretion—then that discretion frustrates immunity's core purpose and should be foreclosed.

49. This Court has foreclosed lower court discretion for similar principles. In *Carswell*, this Court held that district courts may not defer or sidestep early qualified immunity determinations through procedural maneuvering, because "the motion [to dismiss] was the earliest possible opportunity for the district court to resolve the immunity question."[103] When the *Carswell* district court "declined" to rule on the motion and instead required the defendants to postpone until summary judgment, this Court held that was an abuse of discretion. Namely because it "effectively denied defendants the benefits of qualified immunity…".[104] "The rule is that a defendant's

---

[100] *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).
[101] *Id*. (mandating "[i]ndeed, we have made clear that the driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery.") (cleaned up).
[102] *Id*. at 232 (cleaned up) (emphasis added).
[103] *Carswell v. Camp*, 54 F.4th 307, 310 (5th Cir. 2022).
[104] *Id*. at 310 – 311.

entitlement to qualified immunity should be determined at the earliest possible stage of the litigation—full stop."[105] That same logic applies here.

**c. Conclusion: When video evidence is properly part of the pleadings record, qualified immunity must require district courts to review and apply that evidence at the Rule 12(b)(6) stage—because under *Scott* and this Court's precedents, objective video evidence is almost always dispositive to the qualified immunity question and thus cannot be ignored without depriving defendants of a determination at the earliest stage of litigation.**

50. Tying it all together, a district court cannot preserve qualified immunity's core purpose while simultaneously declining to examine dispositive video evidence that is properly before it at the motion to dismiss stage.

51. This Court's precedents already explain why. When video evidence is properly part of the record, the Supreme Court's mandate in *Scott* prohibits courts from crediting allegations debunked by videos.[106] The rule exists to prevent plaintiffs from defeating qualified immunity through artful argument that ignores objective evidence. At bottom—when its available—video evidence is almost always dispositive one way or another in excessive force cases brought under 42. U.S.C. §1983. Said differently, video evidence is almost always the key to determining the qualified immunity question at the earliest possible stage in litigation.[107]

---

[105] *Id.* at 312 (cleaned up) (emphasis added); *see also Asante-Chioke v. Dowdle*, 103 F.4th 1126, 1130 (5th Cir. 2024), cert. denied, 145 S. Ct. 1051 (2025).

[106] *Winder*, 118 F.4th at 643 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[107] *Asante-Chioke*, 103 F.4th at 1130 (explaining that in prior precedents "the district court had the benefit of relying on video evidence showing that there was no dispute of material fact as to whether the defendant officers used unreasonable force. The plaintiffs reasoned that they needed limited discovery to rebut defendants' defense of qualified immunity because of uncertainty

52. Therefore, allowing district courts discretion to refuse review of incorporated video evidence would create an impermissible exception to the core purpose of the qualified immunity doctrine. That result cannot be reconciled with the aims of immunity. Once video evidence is properly part of the pleadings record, the district court's task is not to decide whether it wishes to view it, but to apply settled law to what that record shows. Anything less deprives defendants of the core aims of immunity—a decision on the merits as soon as possible.

53. This Court should therefore resolve this issue of first impression and hold that when video evidence is properly before the district court it must be reviewed when deciding a Rule 12(b)(6) motion asserting qualified immunity. The rule is narrow, administrable, and fully consistent with precedent and the core aim of qualified immunity. A firm rule providing clarity on this issue will provide much needed guidance, and it will prevent appeals from appearing in this Court with unreviewed video evidence that should have been given a first pass by the district court below.[108]

---

surrounding the decedent's death due to the lack of sound in the video. This court held that, for purposes of qualified immunity, further discovery was not necessary because plaintiffs faltered at the first step of our two-step procedure.")

[108] *See Salinas v. City of Houston*, 138 F.4th 822, 826, n.1 (5th Cir. 2025) (noting "the district court, in its November 2023 memorandum opinion and order, declined to consider BWC footage from the Officers' body cameras, stating: 'The court may not look beyond the pleadings in ruling on a 12(b)(6) motion.' But this Court has held that on a motion to dismiss, the court is entitled to consider any exhibits attached to the complaint, including video evidence Plaintiff-Appellants attached BWC footage from Officers Salazar and Garcia….We consider them all on appeal.") (cleaned up).

**B. Issue 2: The video evidence blatantly contradicts Appellees' pleadings accusing Officer Taylor of violating Ramos's constitutional right to be free from excessive force under the Fourth Amendment. The videos show that no constitutional violation occurred here. Taylor is therefore entitled to qualified immunity under first prong of the defense.**

54. Officer Taylor did not violate Ramos's Fourth Amendment right to be free from excessive force.[109] The clear video evidence reveals he should be entitled to qualified immunity under the first prong of the defense. This Court should reverse and render the district court below.

**a. Standard of review on interlocutory appeal.**

55. On interlocutory appeal, this Court reviews the denial of a qualified immunity-based motion to dismiss *de novo*.[110] In interlocutory appeals invoking qualified immunity, this Court has stated that it can review questions of law and examine the *materiality* of facts identified by the district court to preclude immunity. However, this Court has stated that it lacks the jurisdiction to review the district court's decision with regard to the *genuineness* of factual disputes.[111]

56. But, this Court has noted that an exception exists to this jurisdictional limit. Namely when, under *Scott*, the plaintiff's pleadings are "blatantly contradicted" by the video evidence.[112]

**b. The *Graham* factors.**

---

[109] *Graham v. Connor*, 490 U.S. 386 (1989).
[110] *Edmiston v. Borrego*, 75 F.4th 551, 557 (5th Cir. 2023); *see also* FED. R. CIV. P. 12(b)(6).
[111] *Benavides v. Nunez*, 144 F.4th 751, 755 (5th Cir. 2025).
[112] *Id.*

57. "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[113] "Determining whether an officer's use of force was objectively reasonable requires careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[114]

**a. The Deadly Force Standard**

58. As stated by this Court in *Baker*, it is well settled that "the second [*Graham*] factor—whether there is an immediate threat to safety—is generally the most important factor in determining the objective reasonableness of an officer's use of deadly force."[115] Essentially, "[a]n officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others."[116] After the Supreme Court's decision in *Barnes*, it is clear that the Fourth Amendment's reasonableness test is not confined by any temporal limit. Instead, force must be analyzed by "the totality of the circumstances."[117] However, as

---

[113] *Deshotels v. Marshall*, 454 Fed. Appx. 262, 267 (5th Cir. 2011) (citing *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 487 (5th Cir. 2001)).
[114] *Id.* (numerals added) (citing *Graham*, 490 U.S. at 396).
[115] *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023), as revised (May 19, 2023).
[116] *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) (citing *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)).
[117] *Barnes*, 605 U.S. at 80 (2025).

this Court clarified in *Argueta*, the "assessment of whether a suspect's physical actions amount to threatening behavior bearing on an excessive-force claim is a question of law" for the Court.[118]

**b. The first and third *Graham* factors weigh for Officer Taylor's force.**

59. Though these are not the most important factors in a deadly force case, they are briefly addressed. As to the first *Graham* factor, putting aside that officers were looking for this Prius, the videos depict that officers were told Ramos was doing hard drugs in his car with a gun. This Court has held that the first *Graham* factor weighs for officers when they have "reason to suspect that a driver" was "involved in serious drug crimes…".[119]

60. As to the third *Graham* factor, this Court has similarly held that it weighs for officers when a suspect actively refuses to "comply with officers' commands" and subsequently attempts "to evade arrest by flight."[120] Accordingly, it is only the second *Graham* factor that bids this Court's attention on this interlocutory appeal.

**c. Second *Graham* factor: An objectively reasonable officer in Officer Taylor's position could perceive an immediate threat of serious harm the moment Ramos moved his car forward to flee in contravention to voluminous police commands. Under *Barnes*, Taylor's decision to use force was not a violation of the Fourth Amendment**.

[118] *Terrell v. Allgrunn*, 114 F.4th 428, 438, n. 6 (5th Cir. 2024) (citing *Argueta*, 86 F.4th at 1090).
[119] *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 729 (5th Cir. 2018).
[120] *Baker*, 68 F.4th at 247.

61. This Court has held that a car can be a deadly weapon and an immediate threat of serious harm.[121] In *Baker*, this Court explained that "a vehicle can be used as a deadly weapon and if an officer believes he or others around him are in danger from the vehicle, it can be reasonable to use deadly force."[122] Elsewhere, this Court has noted that objectively reasonable officers can believe a vehicle poses a danger if "the projected path of [the suspect's] vehicle was in the officer's direction, at least generally…".[123] But it is irrelevant if in hindsight there was never any real danger. All that matters is if it reasonably appeared that the car was a danger.[124] Here, the clear video evidence reveals that an objectively reasonable officer in Officer Taylor's position could believe that Ramos's Prius posed an imminent danger—to officers and the greater Austin community—when Ramos decided to flee under *Barnes*.

62. In *Barnes*, this Court held that "the dangers to the public and police multiply when a driver flees."[125] Furthermore, "no easy or risk-free answers present themselves when a driver takes off. Letting the driver go endangers the surrounding community and creates perverse incentives, degrading the respect due to those who protect and serve."[126] Intervention after flight "is even more dangerous, whether by giving chase, shooting out the driver's tires, or jumping onto the vehicle."[127]

121 *Id.*
122 *Id.*
123 *Edwards v. Oliver*, 31 F.4th 925, 931 (5th Cir. 2022).
124 *Malbrough v. Stelly*, 814 Fed. Appx. 798, 804 (5th Cir. 2020).
125 *Barnes*, 152 F.4th at 674 (citing *Barnes*, 605 U.S. at 84 – 90 (Kavanaugh, J., concurring)).
126 *Id.*
127 *Id.*

63. For those reasons, *Barnes* held that an officer is entitled to qualified immunity when "a reasonable police officer could have concluded that [the suspect] was intent on flight and that if he were allowed to do so, he would pose a deadly threat for others on the road."[128] This is because when an officer has to react to a suspect using a car to flee, the officer faces "a split-second decision between only bad options."[129] Given the "little time [an officer has] to act" an officer can act "reasonably in using deadly force to end the risk of flight."[130] Here, upon weighing the "bad options" that Officer Taylor faced, and the risk of imminent danger any objectively reasonable officer would discern, Taylor's split-second decision to use deadly force was not a violation of the Fourth Amendment.

64. The videos clearly depict that the APD officers intentionally blocked Ramos from what they believed to be the only exit. They accomplished that blockade by using their patrol cars and their own physical persons.[131] If Ramos meant to use the Prius to flee, the videos establish that an objectively reasonable officer *would know* that the only plausible way to escape would be to drive ***through*** the blockade of APD Officers. Thus, when Ramos chose to put the Prius in drive and pulled forward in an attempt to flee arrest, Officer Taylor faced a split-second decision with only bad options as this Court contemplated in *Barnes*.

---

[128] *Id.* at 676 (cleaned up).
[129] *Id.*
[130] *Id.* (cleaned up) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)).
[131] **ROA.889**, *Hart BWC*, **00:30 – 01:06**.

65. **The first bad option?** Taylor could allow Ramos to drive away unchallenged—and pray that Ramos would not immediately "endanger the surrounding [officers]" by charging the blockade.[132] If this option was chosen, Taylor would be wagering his fellow officers' safety on the irrational hope that Ramos would try to flee via a second nonexistent exit. If such an imaginary exit could be found, APD would no doubt be forced into either: (1) a perilous chase through the City of Austin or (2) allow Ramos the "perverse incentive" of effectuating a dangerous flight in a motor vehicle.[133]

66. **The second option?** Officer Taylor could immediately use lethal force to protect himself and his fellow officers from a desperate man whose only real avenue of escape was to plow ***through*** the blockade. Cars accelerate fast, and any hesitation would allow Ramos to slam into the APD officers and their blockade unchallenged. Video shows that Officer Taylor chose the latter option—to shoot the moment he saw Ramos drive forward. When Taylor did so, he reacted as an objectively reasonable officer to a perceived imminent threat under the totality of the circumstances revealed by the video evidence. Under *Barnes*, Officer Taylor's choice amongst bad options did not violate the Constitution. He is entitled to qualified immunity, and this Court should reverse and render the district court.

### C. Issue 3: Officer Taylor's decision to use deadly force did not violate clearly established law. This Court's ruling in *Estevis* demonstrates that *Lytle* hardly placed it "beyond debate" that every reasonable official would have understood using lethal force on Ramos under the totality of the circumstances was a violation of the Fourth Amendment.

---

[132] *Barnes*, 152 F.4th at 674.
[133] *Id.*

67. This week, the Supreme Court of the United States reminded in *Zorn*, that:

> Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law. A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. A right is not clearly established if existing precedent does not place the constitutional question beyond debate.[134]

68. Additionally, as this Court reminded in *Bakutis*, in qualified immunity cases it is always plaintiff's burden "to produce binding caselaw" that the right was clearly established in light of the specific context of the case.[135] District courts that require the defendant to produce that authority get "that standard exactly backwards…".[136] However, because the district court below found that *Lytle* supplied clearly established law[137]—after declining to review the video evidence—Officer Taylor will rebut *Lytle*.

69. In *Estevis*, this Court recently examined a district court's decision to deny an officer qualified immunity for shots taken at a previously fleeing suspect once his car was no longer moving, was "stalled in the grass" and "surrounded by police vehicles."[138] The *Estevis* opinion noted that the district court below relied "heavily on [this Court's] decision in *Lytle*."[139] This Court then proceeded to sharply limit *Lytle*'s scope.

---

[134] *Zorn v. Linton*, No. 25–297, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026).
[135] *Bakutis v. Dean*, 129 F.4th 299, 306 (5th Cir. 2025).
[136] *Id.*
[137] **ROA.1095** (citing *Lytle v. Bexar Cnty., Texas*, 560 F.3d 4040, 408 (5th Cir. 2009)).
[138] *Estevis v. Cantu*, 134 F.4th 793, 795 – 797 (5th Cir. 2025).
[139] *Id.* at 797.

70. First, *Estevis* noted that there was never any video in *Lytle*, so the *Lytle* opinion was bound by the plaintiff's version of the facts. But more importantly, *Estevis* chided that "[t]he district court read *Lytle* for the proposition that officers cannot shoot at a suspect who has driven away from them if the officers have enough time to realize the fleeing car was no longer a threat. ***That reads Lytle too generally***."[140] Instead, *Estevis* reaffirmed that qualified immunity demanded precedent that "squarely governs the particular circumstances facing officers."[141] Rather than expansive, *Estevis* clarified that *Lytle* only clearly established that officers could not shoot at a suspect who had "driven away from officers for some distance on an open road."[142]

71. Instead, as in *Estevis*, the facts confronting Officer Taylor here are not only factually dissimilar to *Lytle*, but "far closer to the one in *Plumhoff v. Rickard*, where police cornered a fleeing suspect in a parking lot."[143]

72. With *Lytle* distinguished, Appellees will be unable to meet their burden to provide other case law that placed it "beyond debate" that by April 24, 2020, clearly established law held that Officer Taylor violated Ramos's Fourth Amendment rights when he used deadly force.

---

[140] *Id.* at 798 (emphasis added).
[141] *Id.*
[142] *Id.*; *see also id.* at 797 (previously noting the *Lytle* "officer did not fire until the suspect had made it three or four houses down the block.").
[143] *Id.* (cleaned up) (citing *Plumhoff v. Rickard*, 572 U.S. 765 (2014)).

## CONCLUSION & PRAYER

73. In conclusion, Officer Taylor asserts that he is entitled to qualified immunity under both prongs of the defense as to Appellees' excessive force claim. The lower court erred in holding otherwise. Defendant—Appellant, Christopher Taylor requests that this Court reverse the lower court's denial of his motion to dismiss based on his entitlement to qualified immunity and render a take-nothing judgment in his favor.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas 78723
(512) 476-4600
(512) 476-5382 – Fax

By: /s/ Stephen B. Barron
Stephen B. Barron
State Bar No. 24109619
sbarron@w-g.com
Blair J. Leake
State Bar No. 24081630
bleake@w-g.com

**ATTORNEYS FOR APPELLANT CHRISTOPHER TAYLOR**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Amended Brief of Appellant was forwarded to the clerk for the Fifth Circuit Court of Appeals and to counsel of record via e-service through the CM/ECF e-filing program on this 26th day of March 2026.

/s/ Stephen B. Barron
Stephen B. Barron

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2 and 32.3, the undersigned certifies that this Amended Brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B), and pursuant to 5th Cir. R. 32.1 and 32.3, the undersigned certifies that this brief complies with the type-face requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6).

1. Exclusive of the exempted portions in 5th Cir. 32.2, this Brief Contains:

    a. 8405 words, which is less than the limit of 13,000 words.

2. This Brief was prepared:

    a. In proportionally spaced typeface using **Microsoft Word 365** for Macintosh Computers in **Times New Roman font**.
    **14 Point** was utilized for the Body of the Brief. **12.5 Point** was utilized for the Footnotes.

/s/ Stephen B. Barron
Stephen B. Barron
Attorney of Record for Appellant
Christopher Taylor
**March 26, 2026.**